Good morning to the judges of the court. I am Richard Myers, the attorney for appellant Joe Louis Armenta. I would like to reserve five minutes of my argument for rebuttal if it pleases the court. Keep an eye on the clock. Okay. If I could just have a couple of minutes to set this case out. The facts of the case are there was a probation search at my client's residence. During the course of the search, my client's defense was that he had thought it was Eastside Reba criminal street gang members who had broken into his home and were there to kill him. They had made prior attempts on his life. He fired off two or three shots from a .45 caliber handgun with a laser sight. The laser sight becomes important when you calculate or attempt to calculate prejudice in this matter. Anyway, his allegations are on his federal habeas petition, which was brought under 28 U.S.C. 2254, the AEDPA, the Anti-terrorism and Effective Death Penalty Act of 1996. He has five claims of prosecutorial misconduct. Right now, I'm just going to touch on number one, his first claim, and his fifth claim. The first claim occurred when the prosecutor stood up at opening statement and told the jury that the defendant and his lawyer were going to fabricate a defense. After that, there was objections, admonitions, so on and so forth. No, there was an objection, and it was sustained, and there was a curative instruction given. Yeah. And that's so forth. That's what happened, right? Yeah. I didn't get to my two minutes, Judge, but yeah, that happened. That happened. The rest of it. What was the actual quote? Pardon me? What was the actual quote by the prosecutor? It's in my, I believe it's in my brief. No, I don't have it offhand as I stand up here, but it was very close to that. It wasn't vague in that regard. Quote, make up something, unquote. Pardon me? Anticipate made up. Yeah. Yeah, it wasn't vague as to what she meant by that. No. That's why there was an admonition. And so how, with the curative instruction that was given, do we say that the decision by the California Court of Appeals, which accepted the curative section, was unreasonable? Well, it sounds to me like you're talking an aspect of prejudice. Did it cure any harm? And that's why I wish I could have got to my last instance in my initial presentation, because you have to, what happened at the last instance? Oh, go ahead. You have to calculate in with the first instance to get an accurate measurement of prejudice. Sure. Because in the last instance, she told the jury that the defendant had never mentioned his fear of the Eastside Riva criminal street gang at the time of the incident in question. And that was simply a falsehood. That was just not true. He had told investigator LeClaire about it. There's a transcript in my excerpts of record where he told LeClaire that. And also the parties had litigated it at the preliminary hearing. The same prosecutor heard evidence from LeClaire that he had. So on that last one though, help me recreate what happened there. Was there an objection right then and there? No, it came later. And that's a procedural default issue. And so why isn't that procedurally default? Well, you have to look at my brief. Look at People versus Newton. I've looked at your brief and I still have the questions. Have you looked at People versus Newton? Can you tell me about People versus Newton? I have looked at it. Okay. People versus Newton was an almost pattern, almost identical case to this one where the defense attorney had asked the judge while the jury was deliberating if he could introduce a transcript which contradicted statements of the prosecutor in terms of what had occurred at trial. And the state court of appeal in Newton ruled that the judge abused his discretion by not allowing that to happen. That's exactly what happened in this case. And that's why I've given you Newton. In this case, it does not appear that the prosecutors claim that Armenta failed to tell anyone about his fear of gang violence. That was not a misstatement of the facts based on the fear and that he thought it was he said he was in his home. That was their statement. Okay. That's false and untrue. Where was it in the record presented? It wasn't presented in the record. Well, so then how is that false? I mean, it seems like we have to look at the record here. Well, first of all, it wasn't in the record because it didn't need to be. The defendant himself testified. That's why he had the fear. And it was in the record at the preliminary hearing so the Leclerc testified at the preliminary hearing and indicated that the defendant told him he feared the Eastside Rebels and thought it was him in his home at that time. You're saying because it wasn't in the record it was okay for the prosecutor to lie about it and I'm saying no it wasn't. No, I'm not saying that. I'm just saying it's your job to put it in front of us so that we can see. We have to go by the record and to understand, you know, what your argument is and I was just having trouble following your argument when I'm looking at the record and it doesn't look like there was a misstatement of facts based on the record that we have. Well, you have a, what about Leclerc's transcribed statement or the statements of the defendant to Leclerc? I've given you that in the excerpt of the record. Tell me where it is in the excerpt. And that's assuming you can get through the procedural default involving that issue. Well, the procedural default comes under Melendez versus Plyler. The first part of the excerpts are the preliminary hearing transcripts and that's number 8, volume 2. That's the prelim. Well, that's the entire prelim. Pinpoint to me what you think. Okay, and I'm reading from my excerpts of page 0-1, 0-2, especially 0-3, 0-4, 0-5, 0-6, 0-7, 0-8, and 0-9. And then at excerpts volume 2, number 9, we have the statements of the defendant to Leclerc. And I'll just pick out the, there's quite a few, I'll pick out the most obvious ones. Volume 2, number 9, page 0-3, page 0-1-2, and 0-1-8. And what is, what is that, what is there? Well, the defendant told the investigator, this is when the defendant was interviewed, right after the events in Leclerc, investigators, I thought it was the Eastside Riva criminal street gang that had come into my home. That's why I fired off two or three warning shots. Now, of course, this situation eventually disintegrated into a suicide by cop episode when the defendant finally realized it was the cops and so on and so forth. But no more shots were fired. And so this is what he told the investigator Leclerc at the time of the incident. This interview was done, I believe, maybe at the jail, but it was on the same day. Now, and here's my point about the prosecutor. The prosecutor knew from the preliminary hearing that the defendant had said these things to Leclerc, and, but she also knew the defendant's trial lawyer did not introduce this at trial. There was no need to. The defendant testified to it. And so I think my position is she took advantage of that to tell the jury that, oh, he didn't tell anyone that he thought it was the Eastside Rivas. And, of course, that's speculation on my part, but it is not speculation that the statement is false and untrue. The Court of Appeal called it a technical misstatement. And I've given the United States vs. Kojai and Judge Kaczynski's opinion on how we tell the difference between something that is false and untrue or a technical misstatement. And it all boils down to is do we know the difference between a lie and the truth? And that was a lie. And it went to the heart of his defense. And now we're back to the laser sight on the handgun. He was convicted of four counts of attempted murder of a police officer and willful, deliberate, attempted murder of a police officer. When you have a handgun with a laser sight and you touch the trigger, a red dot will light up the target. And this is in a house. We don't have any issues of windage for bullet travel or gravity on the bullet. This is in the confines of a house. You point that thing, light somebody up, and pull the trigger, and a bullet's going to hit them. There's just, it isn't a matter of how good a shot he is or anything else. So my, I submit to you, any slight prejudice would have had a major impact in this trial. We have five instances of it. And under those circumstances, to me anyway, I'm a defense attorney, I've been one for 30 years of it. To me, I don't see how a jury could have come back with the verdict it came back with under the circumstances. But I would say, it doesn't take that much prejudice to make this thing bad, given those facts, given the charge, given the conviction, given the facts. In your last statement, which you say is one of the more significant ones, how is that not procedurally defaulted? I'm sorry. There's a case of, I brief Melendez, it's out of the Ninth Circuit. I'm looking at Fairbank versus Ayers, and that says that California courts consistently apply the contemporaneous objection rule when a party fails to object to the admission of evidence. And because there was a procedural problem there, I'm trying to figure out how that's not... Well, Ayers would be a case where you have no objection. Melendez addresses the case where the objection allegedly came too late. And in this case, the jury was deliberating, and that's where People versus Newton comes in, that I gave you earlier. And we're compelled to follow state law as to cases like Newton. I'll give you a cite for that real quick. Bradshaw versus Ritchie, I'm sure the court's familiar with it. 546 U.S. 74. Bell versus Cone, 543 U.S. 477. Those are both 2005 cases. And it just compels this court to follow California law on that subject. And that subject is, it is an objection that came late. As the jury was deliberating, is that timely? And under Newton, it is timely. It's not only timely, it's an abuse of discretion for the court not to have granted it in almost identical circumstances to the ones we had here. All the judge had to do was have the portions that I just cited to you from McLair's statement read to the jury. And that's what the defense attorney asked for in Newton. I know you're into your rebuttal time at this point, and I don't mean to belabor this, but I just want to make sure I have the facts. Okay. And we don't have to strictly go by my rebuttal. Your client did testify at trial, correct? He did. And during that time, he told the jury that he had, he mentioned the 1999 incident, and he told the jury that he had mentioned that to the police, correct? Yes. And then in closing argument, am I not correct that his trial attorney did rebut the government statement in his closing argument? Somewhat, but not- Not enough of your satisfaction. Yeah, he couldn't tell the jury what way he told McLair this because McLair's statement was not an evidence. So he was limited on his rebuttal. Yeah. Okay. And so he's limited on his ability. That's why he asked the judge, hey, you know, considering this, why don't we give him a clear statement? And Melendez is a case of a delayed objection, not, you know, the Ayers case. And it was under California law, which you're compelled to follow, that objection was timely under Newton. And there's just no way around that. So the procedural default isn't going to apply. I got a yellow light on here. I can't remember what that stands for. I think that's the time you have left. If you want rebuttal, you better say- Yeah, I'll forgo the rebuttal if the court has any more questions. I'd rather answer your questions than worry about the rebuttal. Okay. I don't think we have any questions we'd like to hear from the respondents. Okay. Thank you. Good morning, your honors. May it please the court, Deputy Attorney General Christopher Beasley. On behalf of the respondent, we agree that there are two errors that the prosecutor committed here. The first error being that in the opening statement, the prosecutor said, quote, I anticipate that you are going to hear some excuses from the defense. Some made up stories. That is argument. It does not belong in opening statement. It should have been reserved for closing statement. What would have been a better thing for the prosecutor to have said there is, this case is going to turn on credibility. It will be up to you to decide credibility. That would have been the better thing for the prosecutor to say. Failed to do that. But here, as Judge Bea has pointed out, there was an objection and there was an curative admonition and instruction given to the jury where the court identified the errant statement and directed the jury specifically. The arguments of counsel are not evidence. And to the extent that any inferences could be drawn, negative inferences could from this statement that was errant, you are to disregard that. And we presume that the jury follows the court's instructions. So that was an error that was cured. The second error that we agree occurred in this case was that in closing argument, the prosecutor did say, he's never, the defendant has never told anyone until trial that he was afraid of this gang. The problem with the statement is that in the, in the entire scheme of facts, in the real world, that is a misstatement. Because the truth is that the, that the defendant did tell LeClaire that he had been scared of, of, of, of potential gang reprisal. But, that evidence was not before the jury at all. So the correct argument that the prosecutor could have made and should have made was, ladies and gentlemen of the jury, you have not heard evidence in this case that Mr. Armenta told anyone that he was scared of the gang. Because that would have been a correct statement of the fact before the jury. And I think that that, that shows why that's not even prejudicial. What this prosecutor actually said, which was not correct in the reality of things, was not prejudicial to the fact that there was no objection raised. Judge Morgia, you pointed out there was no objection here until two days later. If this was so significant, if this was the linchpin, then there would have been an objection at that moment. But there wasn't one. It was until two days later. And this is why it is procedurally barred. But, but your, your friend Carl Thou here says that people versus Newton and Melendez, I think is what he says, addresses that. What's your position on that? I think that a good, a proper reading of Newton is that when an objection is late, the trial court has discretion whether to reopen, in this kind of case, where the objection happens during jury deliberations, two days into jury deliberations. The trial court is vested with discretion whether to permit the reopening of evidence, get the deliberations to stop the deliberations, reopen the evidence, and to, and then have the jury start deliberations anew. Because there's a discretionary decision there, the court then has, gets to rule and say, no, I think this is untimely. And because the court has that discretion and the, and the courts here decided this is untimely. That's what's the law of the case in this case. And that's what's binding. And so I don't think that Newton really supports the position that, that, that, that you have to let it open, that you have to open it up when there's an objection that's late. It's a matter that there's discretion. And the trial court here exercises discretion in rejecting the, the, the invitation to reopen the evidence. I also note that had the trial court entertained that invitation to reopen the evidence, and had the trial court admitted the LeClaire interview, what's interesting is that it would not have inured to the benefit of the defendant. The LeClaire interview had the defendant telling LeClaire, I heard the pounding at the door, and I thought it was the police. It sounded like the police. He mentions that several times in that interview. Later in the interview, he does say, I also thought that, you know, that the Eastside Rivas gang was after me, and it could have been them too. But the fact that he made the statement to LeClaire, identifying that I thought the police were at my door, that undercuts his defense. And had that additional evidence come in, it would not have inured to the benefit of the defendant. So, then- Okay, Melendez, does that- Oh, Melendez, I'm not, I can't remember what Melendez says. But I don't think that it's a, it's a rejection of California's contemporaneous objection rule. If I remember, if I'm remembering it correctly. The Fairbanks case, however, clearly does say that California has this contemporaneous objection rule, and this court has followed it, and, and, and has clearly established that it's adequate and independent. And because there was no timely objection here, I think the Fairbanks decision does rule here that this is procedurally defaulted. That's my question in this case. If we're, are we bound to follow Fairbanks no matter what here? Because it's got to be clearly established federal law, since it's a 2254. Right. Right. Yes, that's correct. And I think that we do follow Fairbanks here. There is, there is one exception to the procedural defaults. And that's if there's, if you can show good cause. If there's good cause, it can be shown for setting aside the procedural default. In this case, there is not good cause to set aside the procedural default. We wouldn't have here a fundamental miscarriage of justice. We would not have here a, a, a due process violation. Even if we were to look at the, at the merits of this, of this claim, of this claim of prosecutorial error. Because, as I said, what the prosecutor argued was, was really a reflection of what was in the facts before the jury. While it may have been incorrect looking at the whole universe of facts, the facts before the jury were such that he hadn't ever told anyone else. And so as I mentioned earlier, the prosecutor should have simply confined it to, members of the, ladies and gentlemen of the jury, you have not heard evidence here that he's had, had told anyone previously. Had the prosecutor said that, there would have been no error whatsoever. But because there, the prosecutor didn't confine it to just the facts here. It's a- What did he say, what did Armenta say in his testimony? Armenta testified that he had, that he was scared of, of Isidrevis. And that he had told the police. And the prosecutor's assertion in an argument is, you haven't heard any ev, well, he didn't say it that way, but there hasn't been any evidence that he told anyone other than his trial testimony here, other than what you've heard here in, in trial. So he's telling us now for the first time. And that's what that amounted to. So it was really a rebuttal to what his, his trial testimony was. What, what about the statement that the, that came out that the petitioner had killed somebody in a drive-by shooting in 1999, I think it was. Yeah. A four-year-old child. Yeah. He, okay, so the statement that when the, there was an evidentiary ruling that the trial court made with respect to this gang fire that had taken place. And the trial court's initial ruling was, I don't want any evidence coming in of, of, of the, of the status of the homicide victim. That it was a four-year-old bystander. There was additional argument and additional discussion with the court about what the, what the testimony could be. But it wasn't exactly the model of clarity as to what could come out. And there was never a statement by the trial court, you may not introduce evidence that Armenta was the person who fired a shot that ultimately resulted in death. There was never any sort of ruling like that. It was an unclear ruling. It was discussed enough that you would think that a prosecutor would then ask for a sidebar to clarify that. I, I, best, in hindsight, I think that's correct. I think in hindsight, that might be true. But in the heat of the moment, in the trenches, there was enough that the prosecutor was, I think there was enough question in what the trial court's evidentiary ruling was, that the trial, that the prosecutor proceeded in good faith with what the prosecutor believed it could do. And then later, when it was further hashed out and discussed after the fact, the trial court said, well, had I known what you were thinking, I'm not sure how I would have ruled about it, but I think I would have still allowed evidence to come in. And that's ultimately a, a, a factual determination that was then upheld on the court of appeal, and that becomes a, really a question of state law, as the district court found whether that was what, what the interpretation was of the trial court's ruling. And so I think a fair assessment here is that the prosecutor was not trying to engage in any sort of of missteps here. The prosecutor had a ruling that was not the model of clarity, but a ruling that did allow the, the wiggle room, as the trial court had said, that allowed the prosecutor to proceed in, in eliciting that testimony. It wasn't, that in and of itself, though, isn't, isn't very particularly prejudicial evidence when, when that is weighed against the, the weight of everything that's going on here. And and so I don't think that that would have had any sort of effect on this, on this case. So, a cou, a counsel makes the argument that you tell, you have to look at everything in the aggregate, and this is true. You have to make the aggregate, and he criticizes the way that the court of appeal, the state court of appeal, went through the analysis here, by going step by step from one assignment of error to the next assignment of error, to the next assignment of error. Well, the response is that the only way that you can possibly logically aggregate anything is to understand what the parts are. You can't aggregate components without understanding what the components themselves are. And so the court of appeal went step by step in figuring out, well, what does, what does this first assignment of error amount to? What does the second assignment of error amount to? And then once you have all of those assignments of error, and you know what they are, you can then cumulatively assess, all right, what is the whole weight of all of this? The court of appeal here found that there were only two errors. The first being the opening statement, and the last being the, what the court of appeal termed the technical error, with respect to the closing argument as to the fact. Those two errors don't cumulate to much of anything, because those two errors were first, cured, and second, a correct reflection of the evidence that was actually in front of the jury. It doesn't take rocket science for the jury to look at the evidence and testimony that he never told anyone else this. So there's no prejudice when you take all of this together. And the court, and, and fundamentally under, under 2254, the question really turns on, was the court of appeals decision an unreasonable application of controlling United States Supreme Court authority, or based upon an unreasonable determination of the facts? And we can't say that that's what happened here. The decision here of the court of appeal, the state court of appeal, was reasonable in light of the controlling authority, and in light of the evidence that was presented on this record. And unless this court has any further questions. I have one more question. Yes. Had the, the statement that the defense attorney requested be admitted come into evidence and then read to the jury. Was that to be the entire statement or a redacted portion? I think that, I think that the whole statement would have needed to have come in. I suppose that the, the, the defense would have argued for the redacted portion. And then under the law of completeness, the prosecutor would ask for the entire statements to LeClerc to have come in. Had that come in, that statement to LeClerc come in, what would it have included with regard to the, the defendant's background and connection with the gang and possibly the shooting of the four year old child? The statements to LeClerc, I don't think included anything with respect to the, the shooting of the four year old. The statements to LeClerc were pretty confined to the, the incidents in the house. And what happened and what was going through his mind when the, when the police were knocking on the door and when the police then finally came into the house. And it was, it was pretty limited to that. It did talk about how he had been involved in a gang many years earlier and with the Eastside Revis, but it didn't talk about anything with respect to the, the shooting that had happened between Rudy Gill and the defendant and then the, the four year old victim. Thank you. Thank you, your honors. Thank you very much. All right. First, let's give him two minutes. The incident interview between LeClerc and the defendant. The defendant, you'll see from the sites that I've given you, the excerpts of record. He mentioned the Eastside Revis right off the bat. The transcriber mistranscribed a little bit and had it as Riverside where it would be Eastside Revis, but you, you'll see for Melendez, I cited at page 65 of my opening brief. Melendez applies to the case where a procedural default does not apply when objections are made, not immediately, but still during trial. And at a point when the trial judge realistically could have considered them. Melendez is the controlling authority, not Ayers. In terms of this isn't prejudicial, how could this not be prejudicial? His whole defense was that these are the individuals, the Eastside Revis he thought was in his home. Any slight deviation from that could have a major impact, because we have a case where a guy allegedly took a 45 caliber handgun with a laser sight and couldn't hit any cops that he allegedly was trying to kill in a willful and deliberate and premeditated manner. Newton, the reason the court needs to follow Newton is because Newton is so closely parallel with this case. The idea that we would just jettison Newton and say, well, that doesn't really matter. I still don't understand what the grounds for that would be, but Newton is worth reading in that regard to see how closely identical it is. And in terms of what the judge should have done under California state law, and I'll submit that under Newton, again, it was an abuse of discretion for him to do what he did in this case. I'll finish my- If we would look at that, what do we do with the question of how late this was? I mean, I think the contemporary subjection rule is good law. It's state law. It doesn't violate any federal law, constitutional or otherwise. What are you saying? Are there state laws that say the- No, but what I'm saying is I'm not sure I understand the point. Well, the point under Melendez is- Contemporaneous ruling, objection rule is good law. How does your argument- Well, it comes in two flavors. Are we supposed to find that this was not too late? Is that- Yeah, no, of course not. It comes in two flavors for this court. Ayers, which would be no objection at all, and Melendez, which considers when there was an objection, but the allegation is it was too late for purposes of the contemporaneous exception rule, and it deals with a point blank. Did the state court here find, when it found the procedural default, it found that it was too late? Yes. Okay, so- And it wasn't under Newton. I'm saying it was not too late. So are you telling us that Newton then says that we can go behind that ruling and find that somehow this violates federal law? No, Newton doesn't address itself to the federal question of procedural default. But isn't that the issue here? No, the issue under Newton was, did the judge have the discretion to let him reopen and give him the critical statement that were made to the class? But the issue for us, we have to determine whether or not that was procedurally defaulted. Right, and Newton is your guidepost, not Ayers. Ayers is when no objection was made at all. If you read my briefs, you'll see that. You'll see the difference between the two. And in my reply brief, where I replied to what the Attorney General has argued, they argue Melendez, but then they come to a conclusion that is different than the holding of Melendez. It's kind of, you'll notice that that will jump out at you. Just one last thing, the Ilomeni ruling was made. It's at page 19 in my reply brief. I've set it out in detail. There's nothing vague. There's nothing ambiguous about it. The court gave the parameters. And what prosecutor would stand up after hearing that and ask the questions that she asked of the defendant without at least trying to get a clarifying ruling if she was confused about what it was? Judge McGee, I think you've been a prosecutor. I don't know that you would have read, if you read the quote that I have, if you would have read that and just said, oh, I'm just going to go ahead and ask the defendant if he killed an innocent bystander anyway. A prosecutor, a good prosecutor wouldn't have done that. Thank you very much. Thank you to the court. Thank you very much. Case will be submitted and we'll take a 10-minute recess. All rise. The court stands in recess for 10 minutes.
judges: Bea, Murguia, Keeley